Plaintiff's husband, A.D. Milton, was killed by Willard Thomas, a fellow workman, on February 4, 1943, while they were in the discharge of their respective duties under contracts of employment with defendant, T. J. Moss Tie Company. She sues in her own behalf and as the mother of Orange and Flora D. Milton, aged, respectively, six and two years, issue of her marriage to the deceased, to recover workmen's compensation as in such case provided. The employer and the carrier of its compensation insurance, Consolidated Underwriters, are impleaded as defendants. The pleadings limit the controverted issues to two, viz:
1. That the accident (killing of the deceased) did not arise out of nor in the course of his employment; and,
2. In the alternative, that "his death * * * was the result of a fight or *Page 571 
brawl in which he was the aggressor", and, therefore, recovery is barred under the provisions of paragraph 1 of Section 28 of the Employers' Liability Act, Act No. 20 of 1914, which reads as follows: "That no compensation shall be allowed for an injury caused (1) by the injured employee's wilful intention to injure himself or to injure another, * * *."
Plaintiff was awarded judgment for herself and children for a period of 300 weeks, at $11.37 per week. Defendants after unsuccessful effort to procure a new trial, appealed to this court.
The defendant employer operates a small sawmill in Bossier Parish, at which the deceased and his slayer were working at the time of the slaying. Only two persons of the more than one-half dozen at the scene of the tragedy gave testimony in the case. They are the slayer and a white man named Frank Clark. Their testimony is wholly contradictory and irreconcilable.
The record is barren of any testimony that to any extent, in our opinion, reveals the true cause of the homicide. The facts of each version of the slaying are such as to create the belief that there were pre-existing enmity and bad feeling between these two negroes. The killing is inexplicable on any other theory.
A brief time prior to the slaying the carriage of the mill got off of the tracks and T.J. Shaw, an employee, assisted by some laborers, was endeavoring to put the car back when the slaying occurred. Clark testified that his duty was to operate the edger which had temporarily stopped running. He was standing at one end of the edger, thirty feet from the killing when it occurred at the other end. It was the duty of the deceased and Thomas to keep slabs cleared away so as not to interfere with the edger's free running. Thomas, the slayer, used an axe to trim slabs.
Clark further testified that the deceased worked hard to keep the slabs out of the way and walked close to where Thomas was standing with an axe in his hand. This witness is hard of hearing. He did not hear any words, if any, passed between the men. He saw Thomas raise the axe and strike deceased on the left side of his head, severing the left car. The deceased fell forward to the ground. Death was almost instantaneous. Clark also testified that when he asked Thomas why he killed the man, his reply was that he "cussed" him. He further stated that when the deceased was struck he was facing Thomas with both arms by his side.
Thomas testified that after completion of stacking an accumulation of slabs and ties, he stepped across the roller bed, some twenty feet distant, and got a drink of water and when on his return he had gotten back to the edger table, the deceased addressed him and began to curse and verbally abuse him; that the deceased stepped backward, began to pull off his gloves and then advancing, declared he would cut his, Thomas', head off; that he was then "in hand reach of me * * *; I reached and got the axe and struck him." He says that the deceased had nothing in his hand but was "in the form of getting his knife". He explains this by saying: "By starting his hands in his pocket." He says he knew the deceased regularly carried a knife. He further stated that prior to this time he and the deceased had not had any trouble of any sort.
Whether or not the slaying of one fellow workman by another while in the performance of their duties can be classed as an accident, under any circumstances, arising out of the deceased's employment, has many times been tendered to different courts for decisions. The decisions, even those of the courts of Louisiana, are far from uniform on the subject.
This court in Phelps v. United Carbon Company, reported in 8 La. App. 128, denied compensation. The facts showed that bad feeling arising from family troubles, had existed between the deceased and his slayer, employees of defendant, prior to the killing, which happened while both were at work. The Supreme Court denied a writ of review in the case. This decision was virtually overruled by this court in the case of Keyhea v. Woodard-Walker Lumber Company, Inc., reported in 147 So. 830, decided some six years thereafter. The facts of the Keyhea case are quite similar to those found in the Phelps case. The Supreme Court denied a writ in the Keyhea case also. The Court of Appeal, First Circuit, in Millspaugh v. Opelousas Cotton Gin Company, Inc., 19 La. App. 78, 139 So. 666, ruled as we did in the Keyhea case.
In the case of Pickett et al. v. Southern Carbon Company, decided by this court, and reported in 7 La. App. 296, it was held, as reflected from the syllabus, that: "The *Page 572 
allegations of petition of widow of dead employee that husband was murdered after he was called from his work by one not connected with defendant's business, do not show a cause of action under the Workmen's Compensation Act No. 20 of 1914 as amended, because there is no causal connection between deceased's employment and the injury he received which caused his death."
The Supreme Court in Conaway v. Marine Oil Company, Ltd.,162 La. 147, 110 So. 181, held: "Accidental shooting of foreman at gasoline station, by fellow employee, held not compensable as an accident 'arising out of and in course of employment,' under Employers' Liability Act (Act No. 20 of 1914), § 1, par. 2, and section 2, as re-enacted by Act No. 38 of 1918."
This court requested instructions from the Supreme Court in Ferguson v. Cady-McFarland Gravel Company, reported in156 La. 871, 101 So. 248, and was advised and it was held that: "A track employé who, while at work in a stooping position, was struck on the head with an iron instrument in the hands of a fellow employé, held injured by accident 'arising out of and in course of employment,' within Employers' Liability Act."
[1] This case, in principle, cannot be differentiated from that at bar. In its opinion, the Supreme Court approvingly referred to Dyer et al. v. Rapides Lumber Company, reported in154 La. 1091, 98 So. 677, and to Myers v. Louisiana Railway 
Navigation Company, reported in 140 La. 937, 74 So. 256.
In the Dyer case it was held that:
"Where an employé while making a fire in defendant's engine at night in an isolated locality, was shot and killed by unknown parties, held that the accident arose out of and in the course of his employment within the workmen's compensation statute.
"Where a workman is exposed to some risk manifestly necessitated by his employment, he is entitled to his compensation, unless it be also manifest that he would at the time of the occurrence have been equally exposed to the same risk outside of his employment."
[2] The court in this case quoted from the Myers case as follows: " 'The test to determine whether injuries to a workman arise out of his employment is not whether the cause of the injury, that is, the agency producing it, was something peculiar to the line of employment, but whether the nature of the employment was such that the risk from which the injury resulted was greater for the workman than for a person not engaged in the employment.' "
And in the Ferguson case the court gave these very cogent and convincing reasons for holding that in cases of this character, death is the result of an accident arising out of employment, to-wit: "As employment in gang work, such as decedent was engaged in, necessitates collaboration, the working together of the employees constitutes the nature of such employment, and the risk of assault and personal injury to the employees is to be viewed from that aspect. Obviously, such risk is greater than it would be to a person not engaged in such employment, because such person is not required to be constantly in the presence of an enemy, should he have one."
[3] The weight of authority in this state definitely sustains the contention that when one workman slays another in the course of their employment, the case is compensable unless under some proven special defense, named in the act, the case is removed from the rule fixed by this weight of authority. We think the majority rule correct, and will follow it in the present case.
The defendants mainly rely upon the Conaway case, supra, in which the court quotes from an opinion of the Supreme Court of Massachusetts, appearing in L.R. A.1916A, p. 306. The Conaway case was decided by a divided court. However, it cannot be differentiated in principle from the Ferguson case, unless it be on the ground that in the Conaway case the killing was purely accidental, whereas in the Ferguson case it was intentional. We are unable to perceive wherein this difference affects the principle. The Conaway case, however, was rendered several years after the Ferguson and Dyer cases. But the Keyhea case, in which the Supreme Court denied a writ, saying the judgment was correct, was decided some years subsequent to the Conaway case.
Defendants carried the burden of establishing by a preponderance of proof the special defense set up by them. The lower court ruled against them on this plea. It tenders only a question of fact.
If Thomas' testimony, as a whole, should be believed, it might be said that the special *Page 573 
plea was by a very weak margin sustained. But in view of his interest in exonerating himself from guilt in connection with the homicide, what he said on the subject should be weighed and considered with great care. It is not shown that Clark has any interest whatever in the case.
We have to reject Thomas' testimony when he says he struck the deceased at a time when the deceased was advancing on him. It is difficult to believe that the deceased, wholly unarmed, so far as the record discloses, would have had the indiscreet courage to advance, in a belligerent manner, upon Thomas, when he had an axe in his hand. It does not jibe with human experience. In addition, Clark testified that the deceased when struck was standing erect, no weapon in his hand, with both arms by his side.
Defendants, in support of the special plea, stress the fact that the coroner, some two hours after the slaying, was shown a small knife with one blade open, which was found on the ground not far from the body of the deceased. It is not shown that the knife even belonged to the deceased. The presence of the knife ceases to have significance when considered in the light of Thomas' own testimony wherein he said the deceased was in the act of putting his hand into his pocket when he struck him. Nowhere does Thomas say any knife was drawn by the deceased from his pocket.
It is also argued that because the work gloves of the deceased were picked up from the sawdust after he was slain, that that fact corroborates the testimony of Thomas when he says the deceased was advancing toward him removing his gloves. If he was removing his gloves, surely he was not putting one hand into his pocket at the same time. Work on account of the carriage being off of the tracks had temporarily suspended. The natural thing for deceased to have done in such circumstances was to remove his gloves until work should be resumed. This is what we think he did.
[4] We concur fully in the conclusions of the trial judge that the special plea is not sustained by the testimony.
Not one of the several persons present at the scene of the killing and who should have been able to enlighten the court as to the facts thereof was introduced as a witness by defendants. Plaintiff sought to secure the presence of J.T. Shaw, who is still in the employ of the tie company, for the purpose of cross examination, but the sheriff was unable to serve him with subpoena.
[5] The lower court invoked the rule to the effect that if a litigant fails to call witnesses under his control or within his reach, having knowledge of pertinent facts, the presumption arises that if such witnesses should testify, their testimony would be unfavorable to such litigant. We think the facts of the case warrant application of the rule. However, we also think it unnecessary to do so in order to hold defendants liable to plaintiff as such liability is otherwise established by the record.
[6] The lower court allowed plaintiff $10 for funeral expenses, holding that she paid only this amount on this account in excess of a burial insurance policy carried by the deceased. Both sides complain of the allowance. Appellants argue that proof of payment of the $10 by the plaintiff is not adequate to sustain the judgment, whereas appellee's contention in answer to the appeal and in brief is that she should be allowed to recover the full amount authorized by the statute for burial and funeral expenses, to-wit, $100, plus the $10.
The proof and the law, we think, clearly support plaintiff's position. She paid the $10 to the undertaker employed by the insurer to cover extra charge for hauling the body to a cemetery many miles from the City of Shreveport.
Subsection 5 of Section 8 of the Employers' Liability Act, Act No. 20 of 1914, as amended by Act No. 242 of 1928, provides that: "* * * and in every case of death, the employer shall pay or cause to be paid reasonable expenses of the burial of the employee, not to exceed $100.00 and the reasonable contingent expenses in connection therewith not to exceed $50.00."
It is our opinion that the extra $10 paid by plaintiff can and should be characterized as a "contingent" expense.
[7] The deceased effected burial insurance for $100 and paid the premiums therefor. In keeping with its obligation, the insurer furnished what is called a $100 funeral. This is what the deceased paid for and to which he was entitled. It is of no concern to the employer or its insurer.
The quoted part of the Employers' Liability Act imposes unqualifiedly upon the *Page 574 
employer the duty and obligation to defray the expenses of burial of the insured not in excess of $100. Of course, if a deceased workman does not carry burial insurance and the expense of his funeral is defrayed by his widow or other dependents, only the actual amount of the expenses of the funeral may be recovered of the employer. However, when burial insurance is carried by the deceased workman and his funeral is conducted by the insurer, his widow and heirs are entitled to recover of the employer the amount of the policy not in excess of $100. If this were not true a workman by carrying burial insurance would be paying out his money on premium account for the protection of his employer as much as for the protection of his widow and/or dependents. This is not the law's intention, and certainly is not sanctioned by any rule of equity of which we have knowledge.
For the reasons herein assigned, the judgment appealed from is amended by increasing the amount of burial expenses, etc., to $110, and as thus amended, said judgment is affirmed with costs.